Argued and submitted September 11, 2007, decision of Court of Appeals reversed; judgment of circuit court reversed in part, and case remanded to circuit court for further proceedings January 25, 2008

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## JOSEPH NATHAN LONERGAN,
*Petitioner on Review.*

(CC 200300729; CA A121288; SC S054561)

176 P3d 374

Tammy W. Sun, Deputy Public Defender, argued the cause for petitioner on review. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services, Salem.

Kaye Ellen McDonald, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before De Muniz, Chief Justice, and Gillette, Durham, Balmer, Kistler and Walters, Justices.**

DE MUNIZ, C. J.

Kistler, J., dissented and filed an opinion, in which Balmer, J., joined.

---

** Linder, J., did not participate in the consideration or decision of this case.

## DE MUNIZ, C. J.

Defendant was convicted of escape in the second degree.[1] ORS 162.155(1).[2] The issue before us is whether defendant's use of physical force occurred when he was "escaping from custody" as required to constitute escape in the second degree under the statute. The Court of Appeals concluded that the crime of escape, as defined in ORS 162.155(1), encompasses ongoing, continuous conduct that extends at least during the immediate pursuit of the escapee, and that the use of physical force at any time during a single continuous course of escaping was sufficient under the statute. *State v. Lonergan*, 210 Or App 155, 149 P3d 1215 (2006). We allowed defendant's petition for review and now reverse the decision of the Court of Appeals, reverse in part the judgment of the trial court, and remand for further proceedings.

The underlying facts are undisputed. At 2:15 a.m. on January 12, 2003, Springfield Police Officer Myers responded to a 9-1-1 call regarding a stolen truck. Myers located defendant driving the truck and activated his overhead lights and siren. In response, defendant leapt from the truck while it was still moving, jumped over a guardrail, and ran down a 20-foot embankment into a field of blackberry bushes. Myers eventually caught defendant, handcuffed him, and walked him back up the embankment to the patrol car. When Myers placed defendant against the trunk of his car and reached into the vehicle for his radio, defendant "took off running." Defendant managed to reach a distance of 50 to 75 yards from the patrol car before Myers eventually overtook and tackled him. At that time Myers "deliver[ed] several focused blows to [defendant's] head and shoulders," while defendant continued to fight and kick Myers. Eventually, however,

---

[1] In the same proceeding, defendant also was convicted of unauthorized use of a vehicle, ORS 164.135; attempting to elude a police officer, ORS 811.540; criminal mischief in the second degree, ORS 164.354; and theft in the first degree, ORS 164.055. Defendant did not challenge any of those convictions in the Court of Appeals and does not do so in this court.

[2] ORS 162.155(1) provides, in part:

"A person commits the crime of escape in the second degree if:

"(a) The person uses or threatens to use physical force escaping from custody[.]"

defendant gave up, and Myers walked him back to the patrol car.

The state charged defendant with escape in the second degree in violation of ORS 162.155(1)(a), on the theory that he "us[ed] or threaten[ed] to use physical force escaping from custody." At trial, at the conclusion of the state's case, defendant moved for a judgment of acquittal on the escape-in-the-second-degree charge. Defendant based his argument, in part, on *State v. Metcalfe*, 172 Or App 501, 505, 19 P3d 374 (2001), in which the Court of Appeals held that an escape is complete even if a defendant only "momentarily" leaves a peace officer's control. Based on that holding, defendant argued that he did not use physical force escaping from custody but, instead, used physical force only as he was attempting to avoid recapture after his escape was completed. Therefore, according to defendant, he had committed only escape in the third degree.[3] The state responded that defendant had not "gotten away," because Myers was in close pursuit of defendant the entire time. Therefore, according to the state, the escape was still ongoing when defendant used physical force to resist Myers. The trial court agreed with the state, denied defendant's motion, and found defendant guilty of escape in the second degree. Defendant appealed to the Court of Appeals.

On appeal, defendant again argued that his escape was complete at the point that he left the vicinity of the patrol car, because he had "departed from the immediate presence of the officer and was no longer in the officer's restraint or control." According to defendant, his escape was complete *before* he used physical force in resisting Myers. The state responded that defendant's escape was ongoing "[a]s long as defendant was out of the control of the officer and actively trying to escape." According to the state, a person may have "escaped" in the sense of having successfully freed him or herself, at least momentarily, from an officer's restraint and

---

[3] ORS 162.145 provides, in part:

"(1) A person commits the crime of escape in the third degree if the person escapes from custody.

"* * * * *

"(3) Escape in the third degree is a Class A misdemeanor."

control, but still be "escaping" in the sense of "making good" his or her escape.

In *Metcalfe*, the defendant, who was in a courtroom for a criminal hearing, jumped from his seat, "pushed off of" the officer who had escorted him, and ran toward a door in the back of the courtroom, where he was subdued by other officers. 172 Or App at 503. The defendant was found guilty of second-degree escape. On appeal, the defendant argued that his actions constituted only attempted escape because, during the incident, he remained within the constructive restraint of the courtroom or the actual restraint of one or more deputies. *Id*. Applying the plain meanings of "departure," "custody," and "restraint," the Court of Appeals concluded that

> "[A] person 'escap[es] from custody' within the meaning of ORS 162.155(1)(a) when a person subject to actual or constructive restraint or control by a peace officer sets out on a course of action and that setting out results, *even momentarily*, in the person no longer being within the peace officer's restraint or control."

*Id*. at 505 (second brackets in original; emphasis added). The court also concluded that, based on the plain meaning of "constructive," the scope of an officer's actual or constructive custody of a defendant "consists of those boundaries within which the peace officer can and does exercise *effective* control over the [defendant]." *Id*. (emphasis in original). The Court of Appeals affirmed the defendant's escape conviction, concluding that a reasonable jury could find that the defendant "escap[ed] from custody" at the time that he "pushed off of" the officer who had escorted him, because, however momentarily, he was no longer within the officer's effective restraint or control. The court also held that the fact that the defendant was inside a courtroom and that there were other deputies present was irrelevant to "the scope of the constructive custody to which defendant was subject." *Id*. at 507.

In this case, the Court of Appeals attempted to distinguish *Metcalfe*. Applying the methodology from *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), to the pivotal phrase in ORS 162.155(1)(a), "uses * * * physical force escaping from custody," the court first

determined that its decision in *Metcalfe* did not preclude the state's construction of the statute, "given the statute's syntax, *viz.*, 'escaping,' which can reasonably be understood as connoting a process." *Lonergan*, 210 Or App at 162. The court determined that both defendant's and the state's interpretations of the statute were plausible, given the statutory text and context. Finding nothing conclusive in the legislative history, the court therefore considered maxims of statutory construction, determining that the legislature's purpose in creating a graded scheme for escape was to increase the penalties for escape when "additional risk producing elements" are present, including ongoing, continuous conduct that extends at least during the immediate pursuit of the escapee. *Id.* at 165. For that reason, the Court of Appeals concluded that the trial court had correctly denied defendant's motion for judgment of acquittal on the second-degree escape charge. *Id.*

In this court, defendant reiterates his argument that, when a person has fled from custody and is no longer within a police officer's restraint or control, the escape is complete. Therefore, defendant argues, when an escapee uses physical force in response to the officer's attempt to reestablish custody, he has not "used physical force escaping from custody" as defined under ORS 162.155(1)(a). Defendant posits that his interpretation is faithful to the literal text of the statute and the intent of the legislature, which was "to adopt the traditional legal meaning of escape, *i.e.*, an unlawful departure from custody, as opposed to the broader lay usage of the term that includes evading capture." Defendant asserts that, "[n]owhere does the [statutory] definition of escape describe a continuing activity that encompasses pursuit and recapture."

To decide the question presented in this case, we consider the statutory text in its context. The crime at issue here is escape. "Escape" is defined, in part, as "the unlawful departure of a person from custody * * *." ORS 162.135(5). There are three degrees of escape. *See* ORS 162.145 (defining escape in the third degree); ORS 162.155 (defining escape in the second degree); ORS 162.165 (defining escape in the first degree). "Custody" is defined, in part, as "the imposition of actual or constructive restraint by a peace officer pursuant to

an arrest * * *." ORS 162.135(4). Defendant was convicted of second-degree escape.

Here, defendant had been arrested and placed against the trunk of the patrol car. At that time, he was in custody, because he was under "actual or constructive restraint by a peace officer pursuant to an arrest." ORS 162.135(4). When defendant stood up and ran, he was no longer under the officer's actual or constructive restraint; he had unlawfully departed from custody. *See* Rollin M. Perkins and Ronald N. Boyce, *Criminal Law* 564 (3d ed 1982) ("[T]he limits within which a prisoner may be required by law to remain, at a certain time, may be * * * the immediate presence of his guard on the street * * *. Whatever the limits may be for him at the time [of] a departure therefrom is the physical part of an escape." (footnotes omitted)). By unlawfully departing from custody, defendant had committed an escape, as that term is defined in ORS 162.135(5).[4]

In committing his escape—in *escaping*—defendant did not use physical force or its threat. By definition, then, defendant's actions in running away could not constitute the crime of escape in the second degree: He did not "use[ ] or threaten[ ] to use[ ] physical force escaping from custody." ORS 162.155(1)(a). It was only later, after the officer had tackled him, that defendant used physical force, kicking the officer. At that point, defendant may have been resisting arrest. *See* ORS 162.315 (defining that offense).[5] However, defendant was not escaping; defendant had already escaped.

---

[4] We note that, when defendant ran, he was still handcuffed. The state has not made any argument that the handcuffs were relevant to the determination of when defendant had departed from actual or constructive restraint.

[5] ORS 162.315 provides, in part:

"(1) A person commits the crime of resisting arrest if the person intentionally resists a person known by the person to be a peace officer * * * in making an arrest.

"(2) As used in this section:

"* * * * *

"(c) 'Resists' means the use or threatened use of violence, physical force or any other means that creates a substantial risk of physical injury to any person and includes, but is not limited to, behavior clearly intended to prevent being taken into custody by overcoming the actions of the arresting officer. The behavior does not have to result in actual physical injury to an officer. Passive resistance does not constitute behavior intended to prevent being taken into custody."

.The state argues and the dissent agrees that, when defendant kicked Myers, defendant was *escaping*, in the sense that he was trying to make good on his earlier escape. However, the state and the dissent cannot have it both ways; either defendant had departed from custody, or he had not. As we have explained, we agree with defendant that he had *already departed* from custody when he used physical force. Thus, defendant could not have been *in the process of* departing from custody—he could not have been "escaping," as that term is used in ORS 162.155(1)(a)—when he used physical force.

The state argues that our construction of the statute could result, as the Court of Appeals noted, in a "Keystone Kops" situation, in which a defendant runs away from an officer, is caught and subdued after several yards, runs away and is caught again, and is then charged with multiple escapes. The possibility of such occurrences does not affect the clear meaning of the words of the statute. Should the scenario the state describes occur, an escapee who uses physical force in escaping each time well may be exposed to multiple charges of escape in the second degree, and multiple sentences on conviction of those offenses.

We hold that the trial court erred in denying defendant's motion for judgment of acquittal on the charge of escape in the second degree and the Court of Appeals erred in affirming that conviction. In the trial court, defendant argued that he was not guilty of escape in the second degree but was guilty of escape in the third degree. We agree. ORS 162.145 provides, in part:

"(1) A person commits the crime of escape in the third degree if the person escapes from custody.

"* * * * *

"(3) Escape in the third degree is a Class A misdemeanor."

Defendant's flight from Myers fits that statutory description. Defendant escaped from custody as defined in that statute and the trial court should have accepted defendant's argument in that regard and found him guilty of escape in the

third degree. The case must be remanded to the trial court for entry of such a judgment.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed in part, and the case is remanded to the circuit court for further proceedings.

**KISTLER, J.,** dissenting.

After an officer placed defendant under arrest, defendant broke away and took off running. The majority holds that, in running away from the officer, defendant was not "escaping" from him. The majority's holding is at odds with both the ordinary understanding and the legally accepted meaning of that term. The act of escaping either from an officer's grasp or the confines of a prison does not end once a defendant has broken away from the officer or crossed the threshold of the prison. Rather, the act of escaping includes, at a minimum, the immediate flight from either the officer or the prison. Because the jury reasonably could have found that defendant was in the process of escaping when he was fleeing from the officer, I would affirm his conviction for second-degree escape. I respectfully dissent.

ORS 162.155(1)(a) provides that a person commits the crime of second-degree escape if "[t]he person uses or threatens to use physical force escaping from custody." ORS 162.135(5) provides that "escape" means "the unlawful departure of a person from custody or a correctional facility." The majority reasons that defendant "escaped" from the officer when he broke away from him. In the majority's view, because the crime of escape was complete once defendant broke away, defendant could not have been escaping when he took off running from the officer. In essence, the majority views an "escape" as a single point in time rather than a continuing event. Everything that precedes that point in time is, at most, an attempt, and everything that follows it is irrelevant, at least to the crime of escape.

The majority's interpretation of the term "escape" is at odds with the ordinary understanding of that term. Ordinarily, escape means "to get away (as by flight or conscious effort) : break away, get free, or get clear ‹the prisoner *escaped* from prison›." *Webster's Third New Int'l Dictionary*

774 (unabridged ed 2002) (emphasis in original). That definition does not refer to an escape as a single point in time; rather, it recognizes that escape and, *a fortiori*, "escaping" are not that limited. To be sure, a person has escaped once he or she breaks from the officer's grasp or crosses the threshold of the prison. But the act of escaping from custody or prison does not end there, if the escape is to succeed. It also includes "get[ting] away" from the officer or prison "as by flight." The legislature that enacted the escape statute would be surprised, I submit, to learn that a person who is in the act of fleeing from either the confines of a prison or an officer's grasp is not in the act of "escaping."

The definition of escape in ORS 162.135(5) leads to the same conclusion. As noted, ORS 162.135(5) provides that " '[e]scape' means the unlawful departure of a person from custody or a correctional facility." "Departure," in turn, means "the act of going away" or "setting out (as on a journey * * *)." *Webster's* at 604. Both definitions of departure use a gerund ("going away" or "setting out") to define that term; the use of those gerunds refers to a continuing act, not a single point in time.

Put in the context of this case, defendant began his unauthorized departure from custody when he broke away from the officer, but he was still in the "act of going away" (or, alternatively, he was still "setting out * * * on [his] journey") when he was fleeing from the officer. The statutory definition of "escape" does not provide any reason to depart from the ordinary understanding of that term. Rather, the statutory definition confirms that, when the legislature prohibited the use of force while "escaping from custody," it did not intend to limit the prohibition against using force to the initial act of breaking away from an officer. The prohibition applies equally to the "act of going away"—*i.e.*, to defendant's immediate flight from the officer.

The other courts that have considered this issue have recognized that the crime of escape is not limited to the initial act of leaving custody but instead continues beyond that point. *See, e.g., United States v. Bailey*, 444 US 394, 413, 100 S Ct 624, 62 L Ed 2d 575 (1980); *United States v. Michelson*, 559 F2d 567 (9th Cir 1977); *United States v.*

*Chapman*, 455 F2d 746 (5th Cir 1972).[1] Those courts have held that escape is a continuing crime that extends for the duration of the time that a defendant is absent from custody. This case does not require us to decide whether the crime of escape extends that far. It is sufficient to say, as the words of the statute dictate, that the crime is not limited to the act of breaking away from the officer or crossing the threshold of a prison. It also includes the immediate flight from the officer's grasp and the prison walls.

The legislative history confirms what the text says.[2] The 1971 legislature enacted the second-degree escape statute as part of a comprehensive revision of the state's criminal code. *See* Or Laws 1971, ch 743, § 191 (enacting second-degree escape statute); *State v. Garcia*, 288 Or 413, 416, 605 P2d 671 (1980) (describing process of adopting the 1971 criminal code). The persons who drafted the code explained that they relied on "the risk to others created by the escape" in determining which escapes warranted greater sanctions. Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report §§ 190-192, 194-95 (July 1970) (emphasis omitted).[3] Specifically, they explained that the use of force while escaping increases the crime from third- to second-degree escape because "[t]he use of force in escapes obviously increases the hazards imposed on those obligated to resist such conduct." *Id.* at 195. A defendant's use of force to effect his or her escape (and the ensuing hazards imposed on those obligated to resist the

---

[1] Those courts were interpreting 18 USC § 751(a), which imposes a penalty on persons who "escap[e]" from a federal prison or from custody. *See Bailey*, 444 US at 396 (setting out text of federal statute). The federal statute does not define "escape," but the Court explained that it means "absenting oneself from custody without permission." *Id.* at 407.

[2] In my view, the text of the statute provides a complete answer to defendant's argument. Even if the text were unclear, the legislative history and general maxims of statutory construction lead to the same conclusion as the text.

[3] The 1967 legislature created the Oregon Criminal Law Revision Commission to revise the state's criminal laws. *Garcia*, 288 Or at 416. The Commission divided responsibility for drafting the revised criminal code among three subcommittees. Those subcommittees produced drafts of the code and submitted those drafts, together with commentaries on them, to the Commission, which produced a final draft of the proposed code and presented the final draft and commentary to the legislature. This court has looked to both the commentary and the discussions that preceded the adoption of the final draft as legislative history for the resulting laws. *See id.* at 416-20 (relying on those sources).

escape) does not end the moment that he or she breaks away from an officer's grasp or crosses the threshold of the prison. Rather, it continues during the defendant's immediate flight from custody. *See Buchler v. Oregon Corrections Div.*, 316 Or 499, 507, 853 P2d 798 (1993) (recognizing that inmate could cause harm to persons outside the prison walls "during the stress of the actual escape from custody itself").

One other part of the legislative history bears mention because it specifically touches on the legislature's use of the word "escaping." When the full committee considered the proposed crime of first-degree escape,

> "Representative Frost pointed out that the language in section 4 [defining first-degree escape] used different tenses when it said '*uses or threatens* to use . . . *in escaping* . . .' Mr. Paillette advised that the intent was to refer to a situation where the escape was an accomplished fact. Chairman Yturri explained that Representative Frost's interpretation brought in the connotation of an inchoate crime when the draft said 'in escaping' whereas the draft was intended to mean that the person simultaneously 'used or threatened to use' force or a weapon during the course of an escape.
>
> "There were a number of suggestions for resolving this problem. It was finally determined that the best method was to delete 'in' before 'escaping' in subsection (1) of section 3 [defining second-degree escape] and in subsections (1) and (2) of section 4 [defining first-degree escape]. Representative Frost so moved and the motion carried unanimously."

Minutes, Criminal Law Revision Commission, Mar 18, 1970, 20 (ellipses and emphases in original).[4]

Although that passage discusses the legislature's use of the word "escaping," it does not shed much light on the

---

[4] The full committee was considering the third preliminary draft of the escape statutes. That draft provided that a person commits the crime of second-degree escape if "[h]e uses or threatens to use physical force in escaping from custody." Criminal Law Revision Commission, Proposed Oregon Criminal Code, Preliminary Draft No 3, Art 23, § 3(1) (Jan 1970). That draft also provided that a person commits the crime of first-degree escape if "[a]ided by another person actually present he uses or threatens to use physical force in escaping from custody * * *" or if "[h]e uses or threatens to use a dangerous or deadly weapon in escaping from custody * * *." *Id.* § 4.

specific issue that this case presents. The passage establishes that the first- and second-degree escape statutes apply to the completed crime, not to an attempt. It also establishes that "the draft was intended to mean that the person simultaneously 'used or threatened to use' force or a weapon during the course of an escape." The passage, however, does not explain what the "course of an escape" includes, although the use of the word "course" suggests that "escaping" refers to a series of events rather than a single point in time, as the majority holds.

Although not dispositive, the legislative history is consistent with the plain meaning of the words that the legislature used. Even if the wording of the statute, coupled with the legislative history, left some doubt and it were necessary to resort to general principles of construction to decide this case, I agree with the Court of Appeals that the appropriate principle is to ask how the legislature would have decided this issue if it had considered it. *See Carlson v. Myers*, 327 Or 213, 226, 959 P2d 31 (1998) (stating that inquiry); *State v. Gulley*, 324 Or 57, 66, 921 P2d 396 (1996) (same). In pursuing that inquiry, we should interpret the statute consistently with the drafters' stated purpose—to punish and thus deter the use of force during escapes. *See State v. Lonergan*, 210 Or App 155, 164-65, 149 P3d 1215 (2006) (following that course). As noted, the risk that a person will use force to effectuate an escape is not limited to the act of breaking away from the officer or getting beyond the prison walls. Rather, it extends to the person's immediate flight from custody. The majority's interpretation thwarts the legislature's purpose; the Court of Appeals' interpretation gives effect to it.

Interpreting the statute consistently with its text, history, and purpose, I would affirm the Court of Appeals decision and the trial court's judgment. There was evidence from which a reasonable trier of fact could find that defendant was in the course of immediate flight from the officer's grasp when he hit the officer to effectuate his escape. The trial court correctly denied defendant's motion for judgment of acquittal, and the Court of Appeals correctly affirmed the resulting judgment for second-degree escape. I respectfully dissent.

Balmer, J., joins in this dissent.